UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHERYL MOODY,     Plaintiff,

v.     Civil Action No. 3:17-cv-255-DJH-CHL

LIBERTY MUTUAL LIFE ASSURANCE
COMPANY OF BOSTON,     Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Cheryl Moody brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking review of Defendant Liberty Life Assurance Company of Boston's decision to deny her claim for long-term disability benefits. (*See* Docket No. 1-2) This matter is currently before the Court on the parties' cross-motions for judgment on the administrative record. (D.N. 21; D.N. 22) For the reasons discussed below, the Court will deny Moody's claim and grant Liberty's motion for judgment on the administrative record.

### I.     Background

Cheryl Moody is a former employee of Wal-Mart Stores, Inc., in Louisville, Kentucky. (D.N. 1-2, PageID # 9) On January 2, 2015, Moody suffered a work-related injury while attempting to lift a tray of meat. (D.N. 13, PageID # 171) Over a year after her injury, Moody submitted a claim for LTD benefits under a policy provided by Wal-Mart and administered by Liberty. (*Id.*, PageID # 91) After receiving the application, Liberty advised Moody that it needed "[m]edical records from all physicians including treatment notes, diagnostic test results, therapy notes, procedure reports and hospital discharged reports." (*Id.*, PageID # 293) Liberty thereafter requested that Moody's treating physician, Dr. Raymond Shea, submit all "[o]ffice

1

treatment notes, test results, prescription histories, and treatment plans" regarding Moody. (*Id.*, PageID # 286)

Liberty received medical records from Dr. Shea, which detail Moody's visits to his office between January 16, 2015 and February 6, 2016. In his notes regarding her early visits, Dr. Shea indicated Moody's "acute pain and discomfort in the neck" (*id.*, PageID # 266), her inability to work (*id.*, PageID # 263), her "progressively more severe" neck pain (*id.*, PageID # 262; *see also id.*, PageID # 259–60), and her "loss of motion in flexion and extension of the cervical spine" (*id.*, PageID # 284). In notes dated June 25, 2015, Dr. Shea stated that "[Moody] is permanently and totally disabled." (*Id.*) However, Dr. Shea later opined that while the range of motion of Moody's neck was limited, "there [was] no neurologic deficit and [she had] good strength in her hand." (*Id.*, PageID # 275) Liberty also received information regarding several MRIs Moody had undergone during her treatment from Dr. Shea. An MRI of Moody's spine dated January 17, 2015, showed only "[m]ild degenerative change . . . but no cord compression at any level." (*Id.*, PageID # 270) An MRI dated March 31, 2015, showed only "[m]ild lower lumbar degenerative change with areas of minimal foraminal narrowing." (*Id.*, PageID # 268)

Following receipt of Moody's medical records from Dr. Shea, Liberty submitted a request for a file review to consulting physician Kirsten D'Amore. (*Id.*, PageID # 257) After reviewing Moody's medical records, Dr. D'Amore diagnosed Moody with "[c]ervical sprain/strain, cervical [degenerative disc disease]/spondylosis, [and] neck pain." (*Id.*, PageID # 253) Based on that assessment, D'Amore estimated Moody's restrictions to be "no lifting/carrying over 25 pounds," and indicated that the usual recovery time for Moody's primary impairing condition was "[w]eeks/months with conservative treatment." (*Id.*, PageID # 253–54)

Liberty next referred Moody's claim to a Liberty consulting physician for a full file review. (*Id.*, PageID # 252) In his report, consulting physician Shilpa Kasuganti stated that "[t]he clinical history suggests that initial trauma resulted in the acute strain/sprain injury of [Moody's] cervical spine and lumbar spine which has now transitioned to . . . chronic cervical and lumbar spondylosis that are within the norm for her age and are not causing any neurologic deficit." (*Id.*, PageID # 243) Based on his assessment, Dr. Kasuganti recommended the following restrictions for Moody: "up to frequent walking and standing; unlimited sitting with the ability to change positions as needed; occasional lifting/carrying/pushing/pulling up to 25 lbs.; occasional bending and twisting; no climbing ladders, crawling; occasional kneeling, stooping, [and] squatting." (*Id.*) He also indicated his efforts to consult with Dr. Shea regarding Shea's diagnosis of Moody as "still disabled"—a diagnosis that Dr. Shea's secretary relayed to Kasuganti over the phone: "I asked [the secretary] whether she could clarify with Dr. Shea [regarding Moody's] physical deficits on exam and what prevented [her] from being able to sustain some level of sedentary or light activity . . . . I have yet to receive a reply." (*Id.*, PageID # 242)

On March 22, 2016, based on the records provided by Dr. Shea and the reviews conducted by its consulting physicians, Liberty provided Moody an initial approval for LTD benefits. (*Id.*, PageID # 231–33) The approval followed from the fact that Moody merely needed to show an inability to perform her prior position at Wal-Mart to initially qualify for benefits. (*Id.*, PageID # 55) Specifically, Liberty found that Moody was eligible for LTD benefits effective July 13, 2015. (*Id.*, PageID # 232) Under the terms of the Policy, Moody was entitled to benefits for the 12 months following that date so long as she was unable to perform her prior occupation at Wal-Mart. (*Id.*, PageID # 55) After the 12-month period, to qualify for

continued benefits, Moody would have to demonstrate an inability to perform "any occupation." (*Id.*) Meanwhile, Liberty continued its efforts to communicate with Dr. Shea. Liberty sent Dr. Shea a letter listing Dr. Kasuganti's recommended limitations and asking him "whether or not [he] agree[d] with the . . . restrictions as well as the[ir] duration." (*Id.*, PageID # 209) Shortly thereafter, Liberty received a fax from Dr. Shea, signed on April 8, 2016, on which he placed a check-mark next to "Agree." (*Id.*, PageID # 167)

The initial 12-month benefits period ended on July 12, 2016. Beginning on that date, in order to be entitled to continued benefits, Moody would have to show that she was unable to perform "any occupation." (*Id.*, PageID # 55) The Policy defines "any occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." (*Id.*, PageID # 54) Based on the consulting physicians' recommendations and Dr. Shea's agreement with the recommendations, Liberty case manager Rebecca Turner listed several occupations that were within Moody's physical capacities for work and which qualified as "Any Occupation" under the Policy. (*Id.*, PageID # 157–58) The occupations include badge checker, information clerk, cashier, assembler/small parts, customer service representative, order clerk, and retail salesperson. (*Id.*)

Liberty therefore informed Moody that she no longer qualified for LTD benefits because she did not meet the Policy's definition of "disabled." (*Id.*, PageID # 147–50) Liberty also advised Moody of her appeal rights and instructed her to attach "updated medical information, . . . . [including] any new office visit notes, test results, [etc.]" in the event of an appeal. (*Id.*, PageID # 149) On November 12, 2016, Moody informed Liberty of her decision to appeal. (*Id.*, PageID # 130) In her communication with Liberty, Moody included a letter from Dr. Shea dated March 16, 2016. (*Id.*, PageID # 131) Attached to the letter is one page of

undated handwritten notes, which state: "1) sit 2 hrs., 2) stand 2 hrs., 3) [l]ift [less than] 10 lbs., 4) [b]reaks 4-5 hrs., (5) [m]iss 4-5 days." (*Id.*, PageID # 132) Immediately to the right of the notes is another handwritten notation which states, "Based on our [appointment] today. But you're the doctor!" (*Id.*) Moody also included a Social Security claim form signed by Dr. Shea and dated April 25, 2016—two weeks after Dr. Shea's fax to Liberty in which he agreed with Dr. Kasuganti's recommended limitations. (*Id.*, PageID # 134) In the form, Dr. Shea recommends that Moody can sit for a total of 15 minutes in an 8 hour workday, stand for a total of 15 minutes in an 8 hour workday, lift and carry less than 5 pounds, never use her right arm to work, and use her left arm to work 0-33% of the day. (*Id.*)

On February 16, 2017, Liberty informed Moody of its decision to affirm its denial of LTD benefits. (*Id.*, PageID # 104–09) For the basis of its decision, Liberty cited Dr. Kasuganti's report, the communications between Dr. Kasuganti and Dr. Shea's office, Dr. Shea's April 8, 2016 agreement with Dr. Kasuganti regarding Moody's restrictions and their duration, and the results of Moody's MRIs. (*Id.*, PageID 106–08) Specifically, Liberty noted that

> [d]uring the review of your appeal, Ms. Moody's entire claim file was reviewed. The additional medical documentation submitted on appeal was relatively unchanged from prior office visits. The medical [evidence] continued to indicate that Ms. Moody was unable to carry out activities of daily living, reported continued pain and discomfort and indicated deficits in cervical range of motion. The additional information submitted on appeal did not provide significant changes in her examination findings that would alter the supported restrictions and limitations outlined by Dr. Kasuganti and agreed upon by Dr. Shea.

(*Id.*, PageID # 108)

In April 2017, Moody filed this action seeking review of Liberty's decision to deny her claim for LTD benefits. (*See* D.N. 1-2) Moody and Liberty now each move for judgment on the administrative record. (D.N. 21; D.N. 22)

5

## II.     Standard

Both parties agree that the employee benefit policy at issue is governed by ERISA. (*See* D.N. 21, PageID # 315; D.N. 22, PageID # 324) "A denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 505–06 (6th Cir. 2005) (alteration omitted). "When the plan vests the administrator with discretion to interpret the plan . . . the [C]ourt reviews the benefits denial under the 'arbitrary and capricious' standard." *Corey v. Sedgwick Claims Mgmt. Servs., Inc.*, 858 F.3d 1024, 1027 (6th Cir. 2017) (citing *Sprangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002)). The policy at issue grants Liberty the sole discretion "to construe the terms of [the] policy and to determine benefit eligibility." (D.N. 13, PageID # 84) In any event, the parties have stipulated that the arbitrary-and-capricious standard applies here. (*See* D.N. 14)

The arbitrary-and-capricious standard is highly deferential. "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (internal quotations omitted). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003). The treating-physician rule applicable in the Social Security context is not binding in ERISA cases; "ERISA plan administrators are not obligated to accord special deference to the opinions of treating physicians." *Seiser v. UNUM Provident Corp.*, 135 F. App'x 794, 798 (6th Cir. 2005) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822,

825 (2003)); *see also Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010) ("ERISA does not impose a heightened burden of explanation on administrators when they reject a treating physician's opinion. Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions.").

However, in reviewing a denial of LTD benefits, the Court should also consider "the quality and quantity of the medical evidence; . . . whether the administrator considered any disability finding by the Social Security Administration; and whether the administrator contracted with physicians to conduct a file review as opposed to a physical examination of the claimant." *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 547 (6th Cir. 2015) (internal quotations omitted). Additionally, "when the same entity determines eligibility for benefits and also pays those benefits out of its own pocket, an inherent conflict of interest arises." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). "In close cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits." *Id*. The deferential review applicable here is tempered by a conflict of interest. Under the Policy, Liberty determines eligibility for benefits and also pays those benefits out of its own pocket. (*See* D.N. 22, PageID # 341)

### III. Discussion

Beginning on July 12, 2016, in order to be entitled to LTD benefits under the Policy, Moody had to show that she was "unable to perform, with reasonable continuity, the Material and Substantial Duties of" "any occupation that [she] is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." (D.N. 13, PageID # 54, 55) Based on the evidence in the record, Liberty's initial determination that Moody failed to satisfy this burden was rational in light of the Plan's provisions. Liberty's denial letter outlined the medical

documentation from Moody's treating physician Dr. Shea. (*Id*., PageID # 148) It summarized Dr. Shea's agreement with the following assessment regarding Moody's capabilities: (i) frequent walking and standing; (ii) unlimited sitting with ability to change positions as needed; (iii) occasional lifting/carrying/pushing/pulling up to 25 pounds; (iv) occasional bending and twisting; and (v) occasional kneeling/stooping/squatting. (*Id*.) The letter also explained the occupations for which Moody had been evaluated to be capable to perform based on the agreed-upon assessment. (*Id*., PageID # 149)

In any event, Moody does not question Liberty's initial denial of her LTD benefits. Rather, Moody presents a single argument in support of her motion for judgment on the administrative record—namely, that "Liberty acted arbitrarily and capriciously by relying upon Dr. Shea's office records only up to . . . February 1, 2016, [and] refus[ing] to acknowledge [Dr. Shea's subsequent findings]" on appeal. (D.N. 21, PageID # 320) The subsequent findings at issue are the March 16, 2016 letter containing handwritten notes purportedly from Dr. Shea and the Social Security claim form completed by Dr. Shea on April 25, 2016. (*Id*.)

There is ample caselaw that informs the Court's approach to this issue. The Sixth Circuit has found that it is not arbitrary and capricious for a plan administrator to ignore a treating physician's subsequent finding, at least where the finding conflicts with the physician's earlier opinion or is contradicted by overwhelming evidence in the record. In *Wical v. International Paper Long-Term Disability Plan*, the claimant's treating physician initially found that the claimant could adjust to "other work within certain restrictions on exertion." 191 F. App'x 360, 372 (6th Cir. 2006). The treating physician later changed his opinion and "downgraded his assessment of [the claimant's] ability to work." *Id*. The Sixth Circuit found that it was not irrational for the plan administrator "to give greater weight and credence to other physicians'

8

more-consistent opinions to the contrary." *Id*. As is the case here, the "other physicians" at issue in *Wical* were consulting physicians. *Id*. at 364. Likewise, in *Raskin v. UNUM Provident Corporation*, the Sixth Circuit found that the plan administrator "had grounds for finding [the treating physician's later] opinion deficient [because] [s]he did not provide any new clinical data to support her change of opinion." 121 F. App'x 96, 100 (6th Cir. 2005).

District courts in the Sixth Circuit have ruled similarly. In *Mellian v. Hartford Life and Accident Insurance Company*, the claimant appealed an adverse disability determination and "obtained additional records and opinions from her treating physicians in support of her appeal." 161 F. Supp. 3d 545, 560 (E.D. Mich. 2016). The court held that it was not arbitrary or capricious for the plan administrator to ignore the additional records given their lack of support in the medical record and the fact that the records were contradicted by the physicians' earlier treatment notes. *Id*. at 561–62; *see also Phillips v. Guardian Life Ins. Co. of Am.*, No. 3:08–00660, 2011 WL 1134300, at *8 (M.D. Tenn. Mar. 25, 2011) ("Guardian is not required to give Dr. Heiges subsequent medical opinion deference, especially when his own notes taken at the time he was treating Plaintiff contradicted this opinion."). And in *Campbell v. Hartford Life and Accident Insurance Company*, the court found that the insurer did not act arbitrarily and capriciously in discounting a treating physician's subsequent opinion in which he recommended stricter limitations that conflicted with his earlier findings. No. 12–2848–STA–dkv, 2014 WL 4809940, at *8 (W.D. Tenn. Sept. 26, 2014); *see also Simpson v. Liberty Life Assurance Co. of Boston*, No. 06-11077, 2007 WL 2050428, at *4 (E.D. Mich. July 17, 2007) ("Dr. Bono had originally determined that plaintiff had no restrictions, and then opined that he was not 'functional,' without additional evidence supporting a change in opinion. The reliance on the conclusions of the outside reviewing doctors is not shown to be arbitrary or capricious.").

9

In light of the foregoing caselaw, the Court concludes that it was not arbitrary and capricious for Liberty to discount Moody's subsequent submissions on appeal. Despite these records, Liberty chose to credit the reports of its consulting physicians and find that Moody could work. Given the circumstances, this was a reasonable decision. First, it was neither arbitrary nor capricious for Liberty to discount the handwritten recommendations that appear on Dr. Shea's March 16, 2016 letter. Nearly one month following his drafting of the letter, Dr. Shea sent a fax to Liberty in which he agreed with Dr. Kasuganti's recommendations. (*See* D.N. 13, PageID # 131–132; *cf. id.*, PageID # 167) Given the inconsistency between the opinions expressed in Dr. Shea's letter and subsequent fax, it was not unreasonable for Liberty to place greater weight on the opinion expressed in the fax, which aligns with the conclusions reached by the consulting physicians. *See Wical*, 191 F. App'x at 372. Moreover, as in *Raskin*, Dr. Shea did not provide any new medical evidence to support his change of opinion. (*See* D.N. 13, PageID # 131–34) Indeed, the letter's handwritten recommendations are refuted by Dr. Shea's own medical notes. Throughout his treatment notes, Dr. Shea opines that Moody suffers "no neurologic deficit." (*See, e.g.*, *id.*, PageID # 275) His notes also cite the MRIs that Moody received and which indicate that she has experienced merely "mild" degenerative change. (*Id.*, PageID # 268, 270) It was therefore reasonable for Liberty to place greater emphasis on Dr. Shea's earlier findings, which were based on Moody's MRIs and noted that while the range of motion of Moody's neck was limited, "there [was] no neurologic deficit and [she had] good strength in her hand." (*Id.*, PageID # 275)

It was also reasonable for Liberty to discount the Social Security claim form. The form is dated April 25, 2016—a mere two weeks after Dr. Shea signed the fax in which he agreed with Dr. Kasuganti's recommendations. (*Id.*, PageID # 134) There exists no medical evidence in the

record to show that Moody's condition significantly deteriorated during that two-week period. (*See generally* D.N. 13) Liberty therefore acted reasonable in placing more emphasis on Dr. Shea's earlier findings. In any event, the Court questions whether consideration of the claim form would have changed Liberty's decision. Moody presumably submitted the claim form with her application for Social Security benefits. However, the Social Security Administration denied Moody's claim for disability benefits despite the recommendations contained in the claim form. (*See id*., PageID # 153)

Ultimately, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Nord*, 538 U.S. at 834. The Court must merely determine whether Liberty *arbitrarily* refused to credit Moody's subsequent submissions. *Shaw*, 795 F.3d at 548. Here, the Court finds that Liberty did not act arbitrarily or capriciously in refusing to credit Moody's subsequent submissions on appeal. And none of the remaining *Shaw* factors alter the Court's conclusion. Liberty relied on objective medical evidence in reaching its conclusions. *See id*. at 538. (*See also* D.N. 13) Moreover, although Liberty contracted with physicians to conduct file reviews as opposed to physical examinations of Moody, this fact is not dispositive. *See id*. The Court cannot conclude from the administrative record that the consulting physicians' recommendations were unreasonable. Additionally, the Court has considered the conflict of interest that exists given Liberty's dual roles under the Policy as

determiner of benefits and payor of those benefits and has concluded that Liberty's actions were reasonable nonetheless.[1]

## IV. Conclusion

In sum, after a careful examination of the administrative record and Liberty's dual roles as determiner and payor of benefits, the Court concludes that Liberty's decision to deny Moody's LTD benefits was neither arbitrary nor capricious. Liberty's decision that Moody failed to prove that she was "Disabled" was reasonable under the terms of the Policy.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Moody's motion for judgment on the administrative record (D.N. 21) is **DENIED**.

(2) Liberty's motion for judgment on the administrative record (D.N. 22) is **GRANTED**. This action is **DISMISSED** from the Court's active docket.

(3) A separate judgment will be entered on this date.

June 19, 2018

**David J. Hale, Judge**
**United States District Court**

---

[1] The final *Shaw* factor is inapplicable. There was no disability finding by the Social Security Administration that Liberty could have considered at the time of its decisions. (*See* D.N. 13)